2023 IL App (2d) 220170-U
No. 2-22-0170
Order filed July 25, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BOARD OF EDUCATION OF SYCAMORE COMMUNITY UNIT SCHOOL DISTRICT NO. 427, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-L-105 |
| | ) | |
| SILVERTHORNE DEVELOPMENT CO., | ) | Honorable |
| | ) | Bradley J. Waller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in granting plaintiff school district partial summary judgment on: (1) an ordinance violation count, where it alleged that defendant developer misrepresented the number of bedrooms in its properties in order to pay lower impact fees; and (2) on a counterclaim alleging a municipal plaintiff improperly used impact fees. Affirmed.

¶ 2    Plaintiff, the Board of Education of Sycamore Community Unit School District No. 427

(District), sued defendant, Silverthorne Development Co., alleging that defendant (1) violated an

ordinance requiring it, as a condition of approval of a plat of subdivision or planned unit

development, to pay impact fees (also known as contribution or development fees) based on the

number of bedrooms in properties it built (count I), where defendant allegedly misrepresented the number of bedrooms in its properties; and (2) submitted fraudulent building permit applications and blueprints (count II). Defendant, in a fourth amended counterclaim, sought a declaratory judgment that the District used the fees for improper purposes. The District moved for partial summary judgment, and the trial court granted the District partial summary judgment on count I of its complaint and on the fourth amended counterclaim and found that there was no just reason to delay enforcement or appeal of its ruling. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Defendant appeals. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Ordinances

¶ 5     Section 6.11.3 of the City of Sycamore's Unified Development Ordinance (Unified Development Ordinance) (City of Sycamore Unified Development Ordinance § 6.11.3 (adopted May 1, 2005)), effective as of October 1, 2005, addressed cash contributions in lieu of land for school sites as a condition of approval of a final plat of subdivision or planned unit development. The ordinance, which is the city's zoning code, provided:

> "The cash contributions in lieu of school sites shall be held in trust by the [District][.] The funds collected by the [District] pursuant to this ordinance shall be *used* only for (1) the purchase of real estate or structures for the use as schools or educational facilities for students in Sycamore, Illinois[,] and the [District]; (2) the construction of new buildings for use as schools or educational facilities for students in Sycamore, Illinois[,] and the [District]; or (3) the modification of existing school buildings or educational facilities for

students in Sycamore, Illinois[,] and the [District]. No other *use* shall be made of the funds so collected." (Emphases added.) *Id.* § 6.11.3(I)(B)(2)(a).[1] The estimated cash contributions were "determined at the time the final plat" was approved by the city, and, "prior to the issuance of any building permit," any developer or subdivider paid the District the impact fee attributable to the land relating to the building permit. *Id.* § 6.11.3(I)(B)(2)(b). Payments were made directly to the District, which, in turn, issued a receipt and release of lien as evidence of payment. *Id.* § 6.11.3(I)(D)(b). (Between 2009 and 2015, the District received impact fees directly from developers and home builders that built new homes in the District.) A building permit was not issued unless a copy of the receipt was submitted with the application. *Id.* The Unified Development Ordinance further provided that "[i]ssuance of the building permit without such payment shall not be construed as a waiver." *Id.*

¶ 6 The impact fees were based on the number of bedrooms in the property. For example, for a detached single-family home, the fees were: $817 for a two-bedroom home; $3,269 for a three-bedroom home; $5,560 for a four-bedroom home; and $4,310 for a five-bedroom home. The ordinance defined a "bedroom" as "any room designed, intended, or used principally for sleeping purposes." *Id.* § 1.3.3.

¶ 7 Section 9-4-1 of the city's municipal code, which is its building code, regulates "the conditions and maintenance of all property, buildings, and structures; by providing the standards for supplied utilities and facilities and other physical things and conditions essential to ensure that

---

[1]The school contributions provision of the Unified Development Ordinance amended section 10-3-4 of the city's municipal code. *Id.* § 6.11.3. Title 10 of the city's code contained general subdivision regulations.

structures are safe, sanitary and fit for occupation and use; and *** providing for the issuance of permits and collection of fees therefore[.]"  Sycamore City Code § 9-4-1 (2015).[2]

¶ 8    The International Residential Code for One- and Two-Family Dwellings – 2015 Edition, which was part of the municipal code and one of the codes adopted by the city at the time relevant to this appeal, contained the following provisions.  First, in section R310, it addressed emergency escape and rescue openings:

> "Basements, habitable attics and every *sleeping room* shall have not less than one operable emergency escape and rescue opening.  Where basements contain one or more *sleeping rooms*, an emergency escape and rescue opening shall be required in each *sleeping room*. Emergency escape and rescue openings shall open directly into a public way, or to a yard or court that opens to a public way."  (Emphases added.)  International Residential Code, § R310.1 (2015).

¶ 9    Second, section R314.3 addressed the location of smoke alarms and provided that "smoke alarms shall be installed in *** each *sleeping room*" and "[o]utside each separate *sleeping area* in the immediate vicinity of the *bedrooms*."  (Emphases added.)  *Id.* § R314.3.  Finally, section 315 addressed carbon monoxide alarms and provided that such alarms "in dwelling units shall be installed outside of each separate *sleeping area* in the immediate vicinity of the *bedrooms*." (Emphases added.)  *Id.* § R315.3.

¶ 10                                B.  District's Complaint

¶ 11    On October 7, 2015, the District sued defendant, asserting claims for an ordinance violation (count I) and fraud (count II).  The District alleged that, since at least 2012, defendant had

---

[2]Title nine of the city's municipal code is entitled "Building Regulations."

submitted building permit applications that misrepresented the number of bedrooms in some of its residential properties to show fewer bedrooms than were actually built in each house in order to pay smaller cash contributions. (The District listed 24 properties.) It noted that defendant's marketing materials demonstrated that the homes it sold were all at least three-bedroom, single-family detached homes. Defendant's misrepresentations, according to the District, deprived the District of at least $66,649 in impact fees to which it was entitled.

¶ 12 Defendant denied the allegations, raised several affirmative defenses, and pleaded four counterclaims. As relevant here, in its fourth amended counterclaim, defendant brought a declaratory judgment action, seeking restitution and alleging that the District was depositing impact fees (including fees received from defendant) into its master account and general fund (First Midwest Bank account No. 513572). The account, defendant asserted, is used to fund the District's general operations, and the District impermissibly spent impact fees defendant and other developers paid on general operations from its master fund. The fees were not segregated in an account other than the master fund account. Further, defendant asserted that it paid the impact fees "under protest."

¶ 13                    C. District's Partial Summary Judgment Motion

¶ 14 On December 17, 2019, the District moved for partial summary judgment on count I (ordinance violation) of its complaint and as to defendant's third and fourth amended counterclaims.[3] It alleged that defendant submitted building plans for 24 properties showing, for the most part, that the homes contained two bedrooms, whereas they were sold as three- and four-

---

[3]On July 26, 2017, the trial court dismissed defendant's first and second amended counterclaims.

bedroom homes. The District submitted affidavits from home purchasers addressing the number of bedrooms in their properties. It also noted that it had served Illinois Supreme Court Rule 216 (eff. July 1, 2014) requests to admit, asking defendant to admit or deny that each property at issue contained the number of bedrooms the District had alleged in its complaint. However, defendant objected to the requests, asserting that they sought legal conclusions. Finally, the District noted that it had obtained deposition testimony, affidavits, marketing documents, and appraisals that it alleged confirmed the number of bedrooms for the properties at issue.

¶ 15    The District argued that the Unified Development Ordinance contained the relevant definition of "bedroom," which, it further asserted, defendant had admitted constituted a legal determination. The District also took the position that the Unified Development Ordinance's definition was the same as the term's commonly used and understood definition. It further asserted that the undisputed facts showed that defendant itself listed and advertised its properties as containing three or four bedrooms and that the affidavits showed that the homeowners and appraisers confirmed the number of bedrooms as alleged in the District's complaint. As to the fourth amended counterclaim, the District asserted that the undisputed facts showed that it was not required to deposit impact fees into a separate account and that it nevertheless used the fees in accordance with the law.

¶ 16    In its response to the District's partial summary judgment motion, defendant noted the city's building inspector's deposition testimony that the presence of a closet was irrelevant to whether a room was a bedroom and that a bedroom must qualify as a sleeping room under the International Building Code. Defendant asserted that a sleeping room, per the building code, required smoke detectors (both inside and just outside the room), an emergency egress window, and a carbon monoxide detector. It noted that the city's ordinance stated that only the zoning

administrator can enforce the Unified Development Ordinance. Defendant also pointed to its expert's affidavit statements that the District's accounting practices do not comply with applicable accounting standards, the master fund where impact fees were being deposited carried a negative balance, and there was no interest income on any impact fee deposits. Defendant also argued that the District's director of finance's deposition testimony was contrary to her affidavit and reflected that impact fees were accounted for in the education fund, which was not the fund listed in her affidavit and does not "deal with" capital improvements.

¶ 17                              D.  Depositions and Affidavits

¶ 18                              1.  John Sauter

¶ 19    John Sauter, the city's director of community development (formerly called the director of building and engineering) since 2010, is also a certified residential building inspector and the zoning administrator. Sauter testified that he oversees building inspections for the city and reports to the city manager.

¶ 20    In 2010, the impact fee amount was determined at the initial stage when a developer such as defendant submitted a permit application and indicated on the application the number of bedrooms. That is, the fees were paid upon application. The information was sent to the city clerk's office, which is where monies were paid for the permit. If a builder changed a two-bedroom house to a three-bedroom house, the city required the builder to pay the fee for a three-bedroom house. It was "an accounting function" and not something in which Sauter was involved. There was no procedure in place to change the number of bedrooms after the house was permitted.

¶ 21    When a permit application is received by the city, it also includes building plans and an energy code certification. Sauter's office reviews the material. If rooms are listed improperly, Sauter's office notifies the developer. Once a permit is issued, a home is inspected about 12 to 15

times during the build. The final occupancy inspection concerns the final product and involves an inspector going through every room in the house.

¶ 22    When asked for this definition of a "bedroom" in the scope of his role as building director, Sauter replied that, under the International Residential Code, a "sleeping room" must have an emergency egress window, a smoke detector in the room and just outside the room, and a carbon monoxide detector. Sauter stated that he has never been given an answer as to what is a "bedroom" for purposes of impact fees. He explained that he knows what the International Residential Code requires. He believes that the District should supply him with that information, but it has not done so.

¶ 23    Sauter acknowledged, however, that the building code could be different from the Unified Development Ordinance in terms of defining a bedroom. "If someone were to say a bedroom needs to have a closet or it can have an armoire and that serves as the closet, that's not for me to decide. That's not a code issue or a code concern." "From a code perspective, a closet has no bearing on whether a room is a considered a sleeping room or not." The building code does not define "bedroom."

¶ 24    Sauter informed the District that, in 2015, a builder applied for a permit for a two-bedroom home and then, after final inspection, added a closet and called it a three-bedroom home. Sauter was at the final inspection and observed that a closet was framed but not drywalled. He asked Keith Almady, a former partner in defendant's business, what was going on, and Almady replied that the city charged more for three-bedrooms than it did for two-bedrooms, so the builder waited until the city was "done" and the builder added a closet to make the room the bedroom.

¶ 25    Sauter further testified that, between the Multiple Listing Service (MLS), the code, and Google, there is no single "clear-cut definition" of "bedroom." Sauter offered to the city his

suggested definition: if a room has a closet and it does not have a smoke detector, an emergency egress window, etc., then it should not be considered a bedroom. It can be a den or something else. A closet alone, in his opinion, does not determine whether a room is a bedroom.

¶ 26    The District relies on the city's building department for permit application determinations, "inspection, adequacy, and then final occupancy." Sauter reviewed blueprints submitted with permit applications for several properties at issue in this case and noted that the properties were permitted as two-bedroom homes along with a closet attached to the study/office. If a home has a certificate of occupancy, that means the building was inspected and found to comply with the building and zoning ordinances.

¶ 27    The definition of "bedroom," in Sauter's view, is precise from a code enforcement perspective, but it is "unclear" regarding impact fees. The impact fee ordinance language for a bedroom could be more precise. Sauter would not blame Jim Work, defendant's owner and president, if he did not have a fair understanding of what constituted a bedroom under the impact fee ordinance. Sauter is unaware of the process for changing a two-bedroom home to a three-bedroom home. On July 30, 2015, Sauter responded to an inquiry from defendant, stating that he was unsure of the process for changing the number of bedrooms for purposes of impact fees. He reached out to the District for an answer and never received one.

¶ 28    The labeling of a room as a study/office, for example, on a blueprint is irrelevant for purposes of whether it is a sleeping room under the International Building Code or whether it is a bedroom under the city ordinance.

¶ 29    Sauter further testified that the Unified Development Ordinance's definition of bedroom did not apply to the city's impact fees. The Unified Development Ordinance is the zoning code and contains regulations concerning setbacks and coverage. For safety compliance purposes, the

building code's requirements for smoke detectors and emergency egress windows apply instead. The definition of "bedroom" in the Unified Development Ordinance is broader than the definition of "sleeping room" in the International Building Code. If a developer submits a building permit application and the number of bedrooms change, they are still required to comply with the impact fee ordinance and pay the additional amount of bedrooms, regardless of whether the city approved the initial building permit application.

¶ 30    In Sauter's view, if a room does not qualify under the International Residential Code for a sleeping room, it cannot be a bedroom. The definition of "bedroom" under the impact fee ordinance does not provide much guidance as to what is a bedroom. However, there is nothing in the Unified Development Ordinance that states it would be illegal for a bedroom to not meet the sleeping room requirements.

¶ 31                                    2. Nicole Stuckert

¶ 32    Nicole Stuckert, a certified school business official, testified that she began working for the District in 2009 as an accountant and became its director of finance (now called assistant superintendent for business services) in 2013. In 2013, Stuckert reported impact fees to the school board on a monthly basis, including the number of homes being built within the District and the money collected. She also conducted an annual audit. Stuckert's data came from her department's financial software, which was where deposits were recorded. The District's accountant recorded the deposits coming into the bank account. Developers paid each taxing body separately. Impact fees were paid at the beginning of the build. (The city has since changed the process for collecting impact fees. It now collects them once a home is completed.) The District was not involved in determining how many bedrooms should be permitted. Stuckert was unaware who was responsible.

¶ 33    Stuckert is unaware of the definition of a bedroom as required by the MLS or the Sycamore ordinance.  She is also unaware how a developer could change a two-bedroom permitted house to a three-bedroom permitted house.  The District would not be involved in making that change. There was no corroboration by anyone with the District to determine whether the bedrooms on a permit stub/payment voucher were consistent with the actual house being built.

¶ 34    The District's complaint was brought about after Stuckert's staff noticed that one builder was consistently representing that it was building two-bedroom homes.  The District reached out to the city and asked for "final blueprints" to determine the final number of bedrooms when final occupancy paperwork was issued.  During this process, the District discovered that there was a discrepancy in the number of bedrooms.  Stuckert determines the number of bedrooms in a blueprint by the presence of closets.

¶ 35    In addition to blueprints, Stuckert's office reviewed MLS listings on a realtor's website or defendant's website.  In defendant's case, closets were added after the initial blueprints were submitted.  When asked if the city ordinance requires a room to have a closet in order to be a bedroom, Stuckert replied that it does not, but "common sense" requires it.

¶ 36    Turning to accounting, Stuckert testified that the District has several bank accounts, including the master fund, money market fund, a payroll account, student activity checking account, and food service checking account.  Impact fees are deposited into the master fund at First Midwest bank.  The master fund is used for operating purposes to pay District bills.  Money is transferred from the master fund to other accounts as needed.

¶ 37    In her affidavit, Stuckert averred that impact fees were accounted for in the District's operations and maintenance fund (Fund 20).  She also noted that school districts are required to use fund accounting to account for various revenue sources that can be used only for specific

statutory purposes, and the procedures account for multiple State education board funds, all under a single bank account; there is no statutory requirement to maintain a separate bank account for each fund. She also averred that, in the last 10 years, the District had used impact fees only for two projects: modification of Sycamore Middle School[4] during fiscal year 2012 and the purchase of real estate adjacent to the school in fiscal year 2015.

¶ 38    At her deposition, Stuckert explained that school districts have nine funds (*i.e.*, accounting concepts, not bank accounts) that contain restricted monies that can be spent on only certain items. These funds consist of the education fund, operations and maintenance fund, debt service fund, transportation fund, retirement fund, capital outlay fund, working cash, tort fund, and life safety fund. In the case of impact fees, a cash deposit appears as revenue in the fund. Under the operations and maintenance fund (Fund 20), there is an account called impact fees for revenue, and all cash deposits appear in that account. The District's financial software and accounts listed in its general ledger trace impact fee funds versus property tax dollars being deposited into a revenue account. The software prevents the money from being transferred to an unrelated purpose. Every month, the District runs a bank reconciliation (*i.e.*, reconciles cash and investments to its general ledger) that shows the money it has and what is restricted. Once an impact fee is deposited, the account restricts that money so that it cannot be spent out of the master fund, and the District, through a third party, conducts an audit every year to determine how much money is in the account so that money does not get spent on other items.

---

[4]Sycamore Middle School is the only school in the District and serves all students that live in the District.

¶ 39    The District is not required to have a separate bank account for impact fees. Pursuant to the city's ordinance, Stuckert conducts an impact fee audit in January. As an additional accounting method, the District prepares a spreadsheet listing the builder, subdivision, and impact fee total.

¶ 40    The District uses tax anticipation warrants to make payroll, which is a form of short-term borrowing. Schools receive tax payments in June and September, and the warrants address the cash flow issue. That is, districts borrow money in the short-term to pay their operating costs.

¶ 41    The educational fund does not deal with capital improvements. Its sources of revenue are the tax levy, instructional fees, lunch fees, miscellaneous revenue, and corporate personal replacement tax. The District must follow GAAP practices.

¶ 42    Stuckert reviewed an exhibit (No. 15) (not moved into evidence) of a fiscal year 2014 budget prepared by Mr. Glowiak, her predecessor, and was asked why $230,000 in impact fees were listed under the education fund and nothing was listed in the operations and maintenance fund. She replied that she did not know why this was the case because she did not prepare the budget, although she submitted it (because Glowiak left). She became responsible for budgets beginning in fiscal year 2015.

¶ 43    Reviewing an exhibit (also not moved into evidence) of a fiscal year 2019 budget that she prepared (a year not at issue in this case), Stuckert testified that it showed impact fees from municipal or county governments (code 1930, the code for development contribution fees) under the educational fund and not the operations and maintenance fund. The impact fees are *listed* under the education fund. This could have been a mistake, she stated, but does not indicate that they were actually *used* for education fund purposes. Nor would it indicate that impact fees were used because of any short-term cash shortfall. The tax warrants were a short-term loan because funds in the account are for restricted purposes, such as for impact fees.

¶ 44    At the time relevant to this case, defendant was the only developer in the District that routinely submitted two-bedroom impact fee payment vouchers. The District calculated that defendant owed it $69,101 in impact fees.

¶ 45    The city's ordinance, Stuckert testified, does not require that impact fees be kept in any specific account. It requires an annual audit and that they be *used* only for renovation of existing buildings, purchase of real estate, and new construction. The District used impact fees for only these purposes.

¶ 46    After her deposition, in a second affidavit, Stuckert addressed the documents defendant's counsel asked her to review at her deposition, which had not previously been produced in discovery and which counsel suggested showed that impact fees were being deposited into the District's education fund. Stuckert averred that, after her deposition, she reviewed the District's records to determine which funds the impact fees were deposited into and verified that they were appropriately deposited into the operations and maintenance fund. She also noted that the District's account activity details report recorded the land cash payments from various developers, including defendant, and identified the date of payment, the developer that made the payment, and the amount thereof. She averred that these were the same payments (*i.e.*, impact fees) at issue in this case, and she attached a copy of the reports for the periods July 2012 through June 16, 2016, along with transfer taxes from the city quarterly payments. Next, Stuckert also noted that she attached the District's annual financial reports, which accounted for its revenues and expenses. She noted that a section titled "Other Revenue from Local Sources" identified on line 96 "contributions and donations from private sources," which was the same as "land cash payments" set forth in the account activity details report, were the impact fees that developers were required to pay the District under the city's ordinance. The exhibit, she stated, reflected that the

contributions and donations from private sources were deposited into the District's operations and maintenance fund (and these deposits were also reflected in the District's comprehensive annual financial reports posted on its website and attached). Another entry, on line 97 and labeled "impact fees from municipal or county governments," was the same total of all transfer taxes from the city as set forth in the second exhibit, were not the payments from developers, and were deposited into the District's education fund.

¶ 47                                3. Nancy Edwards

¶ 48    Nancy Edwards was the exclusive real estate agent for defendant in 2013 and 2014. Afterwards, her firm "decided to part ways" with defendant. Edwards testified that Work was very difficult to work with and very demanding. According to Edwards, there were issues and corners were being cut, *i.e.*, workmanship on the homes.

¶ 49    Edwards had also worked with Work in a development in Cortland and, in her opinion, he was "not a man of his word." Under that agreement, Edwards was to receive money for every home sold but that never happened due to issues with the limitations of the sewage system. Edwards terminated her relationship with Work.

¶ 50    Edwards believes that Work intentionally misrepresented the number of bedrooms to try to pay lower impact fees. Work, according to Edwards, sells a lot of homes in Sycamore.

¶ 51    Edwards testified that the MLS definition of a bedroom is a room with a closet and a privacy door; also, the room must be above grade and have a window. Around 2013 or 2014, Work stated that he could sell for a lower price than other builders by building a three-bedroom home for less and then build the closets after the closing. He would also add a door.

¶ 52    Edwards is unaware how the city defines a bedroom for permitting purposes. While working with defendant, Work sent Edwards floor plans, and she completed the MLS listing forms.

The listings were based on the information, including the number of bedrooms, that defendant provided. Edwards' definition of a bedroom is based on how it is designed, and she received the designs from defendant.

¶ 53    Edwards also reviewed defendant's marking materials. She was not aware of any two-bedroom homes that she ever listed for defendant or that defendant built. Two-bedroom homes in the Sycamore region are not common.

¶ 54                                    4. Jim Work

¶ 55    Jim Work testified that, initially, Keith Almady was his partner in the business. Work denied ever misrepresenting the number of bedrooms when permitting homes in order to avoid impact fees. Based on his discussions with Sauter, Work's understanding of the definition of a bedroom is the building code definition.

¶ 56    At some point, Work began writing on impact fee checks "paid under protest," partly based on the District's use of the impact fees. According to Work, the District had informed him that they did not have an accounting of where the money was spent. Work further testified that there were a number of transfers of funds that he was concerned about because the District ran a deficit and monies went from one fund to another.

¶ 57    Work disputed the amount claimed in the District's complaint for impact fees, specifically, the number of bedrooms. Addressing a home sold to the Knautz family, Work explained that the home initially was permitted as a two-bedroom home, but the buyers asked defendant to change it to a three-bedroom home. Defendant asked city personnel for guidance on required filings, and the city replied that nothing needed to be done. No permits, additional blueprints, etc., were required to be submitted.

¶ 58    Edwards represented features in certain homes that were not actually present or entered incorrect listing dates on listing agreements. Work denied having any conversations with Edwards where he stated that defendant would add the closet after the building inspection to pay a lower impact fee. Work fired Edwards, and she has a "bone to pick with" defendant. Edwards' incentive, according to Work, was to add more bedrooms in order to sell at a higher price. Work testified that defendant already had buyers and focused on building what the buyers wanted.

¶ 59    Defendant, for example, applied for permits for two-bedroom homes that eventually became four-bedroom homes, but did not pay any additional impact fee after the initial payment. However, Work explained that there was no process to do that. "We had asked previously, and we were told as long as it's nonstructural, it doesn't matter." That is, so long as the wall is nonstructural and no electrical was involved, no additional permit or blueprints were needed. To Work's knowledge, there is no process in the city to change the number of bedrooms for impact fee purposes after the building process begins. Addressing the homeowner affidavits (addressed below), Work stated that some homes have changed ownership several times since defendant built the homes and that homeowners have made modifications to the homes to add rooms they consider to be bedrooms or count basement bedrooms as bedrooms.

¶ 60    A closet, he explained, has no bearing on whether a room is a bedroom for impact fee purposes. The building code requires a wired smoke detector, egress window of a certain size, etc. Fair housing laws limit builders' discussions with customers concerning family planning and children.

¶ 61    Defendant used a customer portal system, whereby customers entered their desired home features. Work testified that an office, loft, or playroom was referred to as a bedroom in the system.

¶ 62    Work testified that he attempted to determine the definition of a bedroom and was told it did not exist. The city, according to Work, stated that basement bedrooms do not qualify as a bedroom for impact fee purposes.

¶ 63    After final inspection, a certificate of occupancy is issued. Defendant received a certificate of occupancy for all lots upon which it built in the city. Further, upon final inspection, the city never issued correction orders relating to how the bedrooms were permitted or built.

¶ 64                                  5. Ronda Perri

¶ 65    Ronda Perri lives at 2313 Celerity Drive and purchased her home from defendant in November 2014. She testified that her home is the Revere ranch model, the plan for which had two bedrooms and an office/den. As built, Perri's home has three bedrooms on the main level and an unfinished basement. Initially, Perri asked defendant to build a home with two bedrooms and an office, but afterwards, informed defendant that she wanted a three-bedroom home. The only change defendant made to the room to make it a bedroom was to add a closet.

¶ 66                                  6. Dominic Perri

¶ 67    Dominic Perri, Ronda's husband, lived with Ronda at the Celerity Drive residence and later married her. He testified that Ronda purchased the home, but Dominic was present for the home search and meetings with defendant. They picked the Revere model, which had two bedrooms and an office, but they made changes. When they moved in, the home had three bedrooms. The Perris requested the change in the fall of 2014. The home was in the drywall stage. Dominic did not use defendant's portal to communicate his preferences.

¶ 68                                  7. Paul Anderson

¶ 69    Paul Anderson has lived at 418 Northgate Drive in Sycamore since October 2013. He testified that his family purchased the home from defendant. They were looking for (and asked

their realtor to show) either a three- or four-bedroom home. A listing from his realtor, created in August 2013, lists the property as having three bedrooms. When Anderson signed the contract, the home had already been built. Anderson did not use defendant's portal. Anderson further testified that the blueprint defendant used showed a study/office. When he bought his home, he and his wife did not have children. They intended to sleep only in the master bedroom.

¶ 70                                    8. Homeowner Affidavits

¶ 71    In several affidavits, homeowners averred that the homes they purchased from defendant were either three- or four-bedroom homes. For example, Matthew Arnold purchased 625 Brighton Way from defendant and averred that the home was a four-bedroom home and that defendant represented it in conversations as such. KC Brox averred that she owns 609 Brighton Way in Sycamore and purchased the property from defendant. The property is a three-bedroom home and, during conversations with defendant, defendant represented it as such.

¶ 72                                    9. Barry Grant's Affidavit

¶ 73    Barry Grant, defendant's expert, is a certified public accountant (CPA) also certified in financial forensics. In his affidavit, he averred that he has been a CPA for over 42 years, and his clients include schools, universities, cities, and states. Grant averred that he is familiar with generally accepted accounting principles (GAAP) and government accounting standards. He reviewed the documents and depositions in this case. As to Stuckert, Grant averred that she is not a CPA and is not legally qualified to audit a third party or her own work. Her auditing of self-prepared accounting records, he averred, violated accounting standards.

¶ 74    Grant disputed that the impact fees were accounted for in the District's operations and maintenance fund (Fund 20). Based on his review, the impact fees were not being placed in Fund 20, but were placed in other funds, such as the education fund. Grant noted Stuckert's testimony

that there is no statutory requirement to maintain separate bank accounts for each fund, and he opined that the "simplest" fund accounting would be a separate bank account for the impact fees. This would provide a "clean audit trail and would earn interest income that would offset the banking fees." Instead, he noted, "the funds appear to be an interest free loan to the fund holding the money." Grant took issue with Stuckert's assertion that the funds were only used for the purposes set forth in the city's ordinance, stating that this was "difficult to verify" and the fact that she audited her own accounting rendered her opinions "questionable" and they "may not be reliable."

¶ 75    Grant addressed Stuckert's testimony that the District borrowed funds, *i.e.*, her reference to tax anticipation warrants. He opined that this could "only mean the fund was utilizing the contribution fees for working capital[.]" Thus, he further concluded, the impact fees were being used to pay down debt and fund operations associated with general operations and the education fund. "When the [D]istrict is short of funds, they use the contribution fees, and when the [D]istrict has excess funds collecting interest income the [D]istrict keeps the interest income."

¶ 76                                    E.  Trial Court's Ruling

¶ 77    On January 6, 2022, and via an order entered on January 11, 2022, the trial court granted the District partial summary judgment on count I of its complaint and on defendant's fourth amended counterclaim. The court found that the building code was not relevant to the question of impact fees and that the relevant definition of "bedroom" is in the city's Unified Development Ordinance. Relying on the dictionary definition of terms in the ordinance, the court found that the rooms at issue were designed and ultimately used principally or primarily for sleeping purposes.

¶ 78    In granting the District summary judgment on defendant's fourth amended counterclaim, the court noted that Grant did not attach to his affidavit copies of the generally accepted accounting

principles to which he referred. The court found that Grant's opinion that a separate bank account for impact fees should have been used was not based upon any statute or ordinance. The court also took issue with Grant's opinion that Stuckert's claim that the District used the fees only for purposes set forth in the city's ordinance was not reliable. The court noted that Grant did not specify why Stuckert's claims lacked objectivity, and he did not specify a factual basis for disputing that the District was not using fees for working capital. In all, the court found Grant's opinions conclusory and unsupported by facts and it gave "no weight" to his exhibits or affidavit. Accordingly, it determined there was no factual issues precluding summary judgment in the District's favor.[5]

¶ 79    Defendant moved to reconsider, arguing that the trial court weighed affidavits against Work's deposition testimony and did not consider the city's certification of the homes at issue as meeting all ordinances. Defendant also argued that Stuckert's self-serving testimony was contradicted by her own admissions that monies were put in the wrong fund—one for education, not operations and maintenance. The District responded that the court did not weigh the evidence, and Work's conclusory and self-serving statements did not raise material factual questions. As to the fourth amended counterclaim, the District responded that, even if defendant had raised a factual issue about where the District had deposited the impact fees, the District would still be entitled to summary judgment because defendant failed to offer any facts that the District improperly *used* the fees. In any event, it further argued, Grant's affidavit did not raise factual issues concerning

_____

[5]The court denied the District's motion for partial summary judgment as to defendant's third amended counterclaim.

the use of the District's impact fees, and he instead made conclusory statements unsupported by facts based on his personal knowledge.

¶ 80   On April 21, 2022, the court denied defendant's motion to reconsider. It noted that the affidavits were irrelevant because the request to admit framed the issue as a legal question on count I. As to the fourth amended counterclaim, the court determined that there were no allegations that the District violated any laws in depositing the impact fees. As to the allegation that it used the monies for improper purposes, the court found that no material factual issues existed to support this allegation. It corrected its initial finding and clarified that it "did not weigh" Stuckert's and Grant's affidavits. "That was not my intent to use that term." The court reiterated that Grant's affidavit statements were conclusory and "completely devoid of any factual basis," including his conclusion that it "can only mean" that the District was using the impact fees for working capital. The court specifically noted that Grant did not provide a factual basis for his conclusory statement that the District improperly used the impact fees. Turning to Stuckert's statements, the court found that they were not substantively inconsistent. The court also found that there was no just reason to delay appeal of judgment in the District's favor. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Defendant appeals.

¶ 81                                    II. ANALYSIS

¶ 82   Defendant argues that the trial court erred in granting the District summary judgment on the ordinance violation count (count I) of the District's complaint and on defendant's fourth amended counterclaim. For the following reasons, we reject defendant's arguments.

¶ 83   Summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS

5/2-1005(c) (West 2020). In deciding a summary judgment motion, the court must construe the pleadings, affidavits, depositions, and admissions on file strictly against the moving party and liberally in favor of the opponent. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162-63 (2007). Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. *Id.* at 163. We review *de novo* the granting of a motion for partial summary judgment. *Sinclair Oil Corp. v. Allianz Underwriters Insurance Co.*, 2015 IL App (5th) 140069, ¶ 34.

¶ 84    The rules of statutory construction apply to the interpretation of municipal ordinances. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). The fundamental objective of statutory construction is to ascertain and give effect to the drafter's intent. *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 268 (2010). The statutory language, given its plain and ordinary meaning, is the best indication of legislative intent. *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010). If the language is clear and unambiguous, it will be given effect without using any other aids of statutory construction. *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 67. We review *de novo* questions of statutory construction. *Ries v. City of Chicago*, 242 Ill. 2d 205, 216 (2011).

¶ 85                     A. Count I - Ordinance Violation

¶ 86    Defendant argues that the trial court should have construed the Unified Development Ordinance and the city's building code in harmony and determined that a legal "bedroom" must

have an egress window, smoke detector, and a carbon monoxide detector. Alternatively, it argues that, regardless of whether the city's building code applies, factual questions exist concerning whether the rooms at issue were designed and/or intended principally for sleeping purposes, such as whether a basement bedroom was intended or used principally for sleeping purposes or whether a home sold to a couple with no children was designed or used as a four-bedroom home and where smoke detectors were not installed in two of the bedrooms. In defendant's view, factual questions existed as to whether it misrepresented the number of rooms intended principally for sleeping purposes on its permit applications. Defendant finally notes that a builder must abide by all laws and that, by issuing a certificate of occupancy, the city acknowledged that construction complied with all of its laws, including the Unified Development Ordinance.

¶ 87      Preliminarily, defendant argues that its response to the District's request to admit does not automatically turn what constitutes a "bedroom" into a pure question of law, because Rule 216 requests to admit do not permit the admission of legal conclusions. Further, defendant contends that, while what constitutes a "bedroom" under the Unified Development Ordinance is a legal question, resolution of that question under the District's definition is grounded in factual issues—for example, whether a bedroom is intended for sleeping purposes is a factual question. Defendant maintains that the District's interpretation of sleeping purpose is subjective, while defendant's interpretation is objective. We reject this claim. The definition of a "bedroom," which requires us to construe an ordinance, presents a legal question. Furthermore, defendant is bound by its response to the request to admit.

¶ 88      Turning to the central issue, we conclude that the trial court did not err in granting the District summary judgment on count I of its complaint. First, the court correctly determined that the Unified Development Ordinance is the only relevant statute. The Unified Development

Ordinance addresses impact fees, contains a definition of "bedroom," and nowhere reflects that it must be harmonized with the city's building code. The Unified Development Ordinance focuses on the needs of an area with a growing population for, as relevant here, adequate school facilities. Unified Development Ordinance § 6.11.3. It does not address building safety. The city determined that cash contributions (*i.e.*, contribution/impact fees) in lieu of the dedication of land for school sites will be assessed on all final plats of residential subdivisions and planned unit developments, the amount of which is determined at the time of final platting. *Id.* The city's municipal code, which is its building code, in contrast, addresses building standards to ensure safety. Sycamore City Code § 9-4-1 (2015). It does not address or regulate contribution/impact fees. The ordinance and code, therefore, are not related. Furthermore, they each contain their own definitions of bedroom-type rooms. The Unified Development Ordinance defines a "bedroom" as "any room designed, intended, or used principally for sleeping purposes." Unified Development Ordinance § 1.3.3. The municipal code, incorporating the International Residential Code, contains safety requirements for a "sleeping room," specifying that it must have a smoke alarm therein, there must be an alarm outside each sleeping area, a carbon monoxide alarm in the sleeping room, and a means of egress therefrom. International Residential Code §§ R310.1, R315.3 (2015). Nowhere do the enactments indicate that the definitions must be harmonized, nor can we contemplate any policy reason to do so where there is no relationship between building safety and school funding. Accordingly, the Unified Development Ordinance is the relevant enactment and its definition of "bedroom" is the proper focus of this appeal.

¶ 89   Having determined the proper source of the definition of a "bedroom," we turn next to the evidence presented supporting the number of such rooms. We conclude that no material factual questions were raised concerning the number of bedrooms in the properties at issue. The affidavits

and depositions the District obtained from homeowners reflected that defendant represented that their homes contained either three or four bedrooms, not two bedrooms, which defendant represented in calculating its impact fees. (These documents were further supported by real estate listings.) Relying on the dictionary definition of "bedroom," the trial court found that the rooms at issue were designed and used principally or primarily for sleeping purposes. We agree with the trial court that the commonly understood and dictionary definition of "bedroom" is the same as that in the Unified Development Ordinance and, thus, it is the same as the homeowners' understanding of such (in the absence of any indication that the homeowners meant otherwise when they categorized their homes as either three- or four-bedroom homes). See Unified Development Ordinance § 1.3.3 (a "bedroom" is "a room furnished with a bed and intended primarily for sleeping"); see also Websters Ninth New Collegiate Dictionary 139 (1985) (a "bedroom" is "a room furnished with a bed and intended primarily for sleeping").

¶ 90    We need not espouse on whether specific features need be present to transform a room into a bedroom because we disagree with defendant that Work's testimony raised a factual issue concerning the number of bedrooms in the properties at issue. Work offered no support for his opinions, and we agree with the District that his dispute was based on the definition of a bedroom, as he testified that he attempted to determine the definition of a bedroom and was told it did not exist. He also *acknowledged* applying for permits for two-bedroom homes that eventually became four-bedroom homes, but did not pay additional impact fees after the initial payment because there was no process in place to do that. His statements otherwise consisted of self-serving opinions insufficient to raise a factual question. See *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1029-31 (2001) ("When determining whether factual issues exist for purposes of a summary

judgment motion, we must ignore personal conclusions, opinions and self-serving statements and consider only facts admissible in evidence.").  (Internal quotation marks omitted.)

¶ 91    For example, Work was questioned about four affidavits.  First, with respect to 625 Brighton, Work asserted that he "disputed" that a home was a four-bedroom home because one of the bedrooms was in the basement, but he did not testify that it was a two-bedroom home (as represented when defendant calculated its impact fees).  Second, with respect to 609 Brighton Way, he conceded the home was a three-bedroom home and complained only about an unanswered question from the City about where to direct a check.  Third, with respect to 2349 Pioneer Way, Work acknowledged the home contained three bedrooms and a loft and then noted his dispute with the definition of bedroom: "Is it a basement?  Is it a loft?  I don't know."  Finally, with respect to 2325 Pioneer Way, Work conceded adding drywall in the basement to create a bedroom in the four-bedroom home; he did not assert it was a two-bedroom home.

¶ 92    Defendant argues that the homeowners' testimony that they were sold homes with a certain number of bedrooms does not undisputedly establish that the alleged bedrooms were going to be principally used for sleeping purposes.  Defendant also argues that, regardless of the definition of "bedroom," and drawing all reasonable inferences in its favor, the following evidence showed that factual questions exist as to whether the bedrooms referenced in the homeowners' affidavits were intended to be used principally for sleeping purposes: Sauter was clear that the bedrooms at issue could not be used for sleeping purposes because they lacked life-safety equipment; Work testified that many of the bedrooms at issue were not going to be used for sleeping purposes; Work testified that defendant constructs homes beyond what it advertises; and Sauter testified that rooms without proper safety equipment cannot be a sleeping room, and a closet is not relevant to whether it will be used for sleeping purposes.  We disagree that this evidence raises any factual questions

concerning the number of bedrooms. Sauter's statements concerning safety equipment were based on his belief that the building code contains the proper definition of a bedroom-type room, which we reject. Further, Work's testimony concerning the actual or intended use of particular bedrooms misreads the definition of "bedroom" in the Unified Development Ordinance. Whether a room is "designed, intended, or used principally for sleeping purposes" does not require that a given family use it as a bedroom, as that term is commonly understood. The definition incorporates rooms "designed *** for sleeping purposes" and, therefore, it is not dependent on its specific occupants' actual use of the room.

¶ 93    Finally, we note that whether the city issued a certificate of occupancy is not relevant to determining the number of bedrooms. Defendant added closets after final inspections. Further, the building permit application states that the city's approval of plans does not relieve a builder from complying with all city ordinances and laws.

¶ 94    In summary, under the narrow circumstances presented, the trial court did not err in granting the District summary judgment on count I of its complaint.

¶ 95                    B. Fourth Amended Counterclaim

¶ 96    Next, defendant argues that the trial court erred in granting the District summary judgment on the fourth amended counterclaim. It notes that the Unified Development Ordinance limits the use of impact fees for the purchase of real estate or structures for the use as schools or educational facilities, the construction of new buildings for use as schools or educational facilities, or the modification of existing school buildings or educational facilities. Unified Development Ordinance § 6.11.3(I)(B)(2)(a). Impact fees, it further notes, cannot be used for general operations, but Stuckert's testimony and the District's financial records, it asserts, shows that they were being used for such. Defendant asserts there are factual questions as to whether the impact fees are

"void" based on actual expenditures made in contravention of the Unified Development Ordinance. As evidence that the fees were being spent for purposes other than those authorized by the Unified Development Ordinance, it points to the alleged deposit of impact fees into the education fund.

¶ 97    Defendant primarily bases its arguments on Stuckert's testimony. Specifically, it contends that her affidavits contradict her deposition testimony and, thus, raise factual questions as to whether the District deposited impact fees into its educational fund. Defendant contends that a party's later submission of an affidavit inconsistent with that party's deposition testimony cannot raise a factual dispute. Here, it asserts, Stuckert's second, post-deposition affidavit attempted to alter her deposition testimony by removing a factual question as to whether the fees were accounted for in the wrong fund. Just as a party cannot submit a later affidavit to create a factual question, defendant posits, it follows that a party cannot submit a later affidavit to remove a question of fact. Defendant also argues that, by choosing to credit Stuckert's attestations that the funds were not improperly spent, the trial court erroneously weighed the evidence and the credibility of her attestations against her deposition testimony and the objective financial records.

¶ 98    Defendant also takes the position that the "deposit" of impact fees into the incorrect restricted fund is direct evidence that the fees were misspent. The fact that they were deposited into the education fund (which it asserts Stuckert's deposition testimony shows), it asserts, raises the reasonable inference that the fees were not spent on new school buildings or improvement of existing school buildings. Thus, a factual question exists, defendant argues, as to whether it is entitled to a refund.

¶ 99    Defendant also relies on Grant's affidavit, arguing that it raised a factual question as to whether the District misspent the impact fees it received. It points to Grant's conclusion that the

District was utilizing the impact fees for working capital and placing them in improper funds. The trial court, defendant asserts, erred in placing no "weight" in Grant's affidavit, where weighing and assessing evidence is improper in deciding a summary-judgment motion. Defendant also takes issue with the court's determination that Grant's affidavit consisted of statements unsupported by facts. It argues that Grant's affidavit reflects that he relied on documents and Stuckert's testimony as support for his conclusions.

¶ 100   We conclude that the trial court did not err in granting the District summary judgment on defendant's fourth amended counterclaim. No material factual issue existed concerning the District's use of the contribution/impact fees.

¶ 101   The Unified Development Ordinance provides:

> "The cash contributions in lieu of school sites shall be held in trust by the [District][.] The funds collected by the [District] pursuant to this ordinance shall be *used* only for (1) the purchase of real estate or structures for the use as schools or educational facilities for students in Sycamore, Illinois[,] and the [District]; (2) the construction of new buildings for use as schools or educational facilities for students in Sycamore, Illinois[,] and the [District]; or (3) the modification of existing school buildings or educational facilities for students in Sycamore, Illinois[,] and the [District]. No other *use* shall be made of the funds so collected." (Emphases added.) Unified Development Ordinance § 6.11.3(I)(B)(2)(a).

¶ 102   The ordinance precludes the "use" of funds for purposes other than the three enumerated therein.

¶ 103   In her first affidavit, Stuckert averred that impact fees were accounted for in the District's operations and maintenance fund (Fund 20) and that the District *only used the fees for the purposes set forth in the ordinance*. She also averred that, in the last 10 years, the fees had been used for

only two projects: the modification of the middle school in 2012 and the purchase of real estate adjacent to the middle school in 2015. At her deposition, she similarly testified that the District used impact fees only for the purposes set forth in the ordinance.

¶ 104 Stuckert also addressed the District's accounting practices. Impact fees, she testified, are deposited into the master fund. There is no statutory requirement to maintain separate bank accounts for each fund. Pursuant to fund accounting practices, they are accounted for in the operations and maintenance fund (Fund 20) and are restricted monies that can be spent only on certain items. The District's financial software traces impact fee funds versus property tax dollars deposited into a revenue account and prevents the money from being transferred to an improper purpose. Monthly, the District runs a reconciliation that shows the money it has and what is restricted. Also, through a third party, the District conducts an annual audit to assess how money is spent. Stuckert testified that she conducts an annual audit. The District also maintains a spreadsheet showing the impact fees paid by each builder for every subdivision.

¶ 105 Turning to the focus of defendant's argument, Stuckert was shown two exhibits during her deposition, neither of which were moved into evidence. The first exhibit (No. 15) was a fiscal year 2014 budget that was prepared by her predecessor; Stuckert became responsible for budgets beginning in 2015. Stuckert explained that she did not prepare the budget and thus did not know why $230,000 in contribution fees were listed under the education fund and nothing was listed in the operations and maintenance fund. We cannot conclude from the foregoing that a material factual question was raised that the District was improperly accounting for impact fees in the education fund. Clearly, it is undisputed that Stuckert did not prepare the exhibit that she was asked to review. Further, as noted, the primary inquiry concerning the counterclaim is whether the impact fees were used for purposes other than those specified in the Unified Development

Ordinance. The foregoing allegations do not sufficiently connect any deposits to impermissible expenditures.

¶ 106    The second exhibit (No. 16) involved a fiscal year 2019 budget, which was a period which is not at issue in this case. Nevertheless, Stuckert reviewed the exhibit and stated that it showed impact fees under the education fund, not the operations and maintenance fund, and that this could have been a mistake, but did *not* indicate that the funds were actually *used* for education fund purposes. Nor would it, she continued, indicate that impact fees were used because of any short-term cash shortfall. The foregoing, we conclude, does not raise a factual question concerning the District's use of the impact fees. The data at issue involved a year that is not at issue in this case, and Stuckert explained that the budget did not reflect that the impact fee funds were improperly used, which is the subject of the ordinance and the basis of defendant's counterclaim. Further, in all, Stuckert's testimony did not contradict her affidavits.

¶ 107    Defendant did not produce evidence raising a material factual question. We agree with the trial court that Grant's affidavit contained conclusory and unsupported statements. Grant did not provide facts showing that the District used the contribution/impact fees for general operating purposes. Rather, he made unsupported and conclusory statements about where the District deposited the fees, that it violated GAAP standards (without attaching copies of the relevant standards), and opined that it should have invested the fees.

¶ 108    Affidavits, including expert's affidavits, filed in the summary judgment context serve as substitutes for trial testimony and must strictly comply with Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013). *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335-336, 339 (2002). Rule 191(a) provides that affidavits filed in support of or in opposition to a summary judgment motion:

"shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto. If all of the facts to be shown are not within the personal knowledge of one person, two or more affidavits shall be used." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

¶ 109 "An affidavit utilized in a summary judgment procedure is subject to a more stringent admission standard than testimony at trial, where an expert can be cross-examined, the expert's underlying facts and data can be probed, and the expert's conclusions can be tested." *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶ 61. Rule 191 bars conclusions for which the affiant provides no specific factual support. *Id.* ¶ 63. The expert's opinion cannot be based on conjecture or speculation. *Id.* ¶ 64. Use of terms such as "likely" or "might" are not based on facts, nor is an opinion on what a "typical" person would do. *Id.* ¶¶ 68-69.

¶ 110 Grant averred that Stuckert's testimony reflected that the impact fees were deposited into the education fund. In support of this opinion, he cited to Stuckert's testimony concerning the budget her predecessor prepared (the year is unspecified in her deposition) and her statement that she did not know why certain funds were listed in the education fund and no monies were listed in the operations and maintenance fund. We conclude that Grant provides an insufficient factual basis for his opinion that the District was commingling funds. Without facts indicating the amount of impact fees received in this particular year, for example, it is a great leap to conclude that the funds were being commingled.

¶ 111    Grant also took issue with the fact that the District did not maintain separate bank accounts for each fund.  However, he relied on no statutory authority for this proposition, whereas Stuckert testified that there is no statutory requirement to maintain separate accounts.  Indeed, Grant averred that the "simplest fund accounting" was to maintain separate accounts, but he did not aver that this was required.  He also averred that the funds "*should* have been invested" (emphasis added), but cited no authority that *required* that this be done.

¶ 112    As to the central question of how the District *used* the impact fees, Grant relied on his opinion that the District commingled the impact fees with other funds to further opine that Stuckert's statement that the fees were used only for proper purposes under the ordinance was "very difficult for her to verify" and that, because she audited her own accounting, "her opinions are questionable and may not be reliable."   These statements, we believe, do not contradict Stuckert's statements and do not raise a factual question concerning how the District used the impact fee monies.

¶ 113    Grant twice noted Stuckert's testimony that the District was borrowing funds, opining: "which can only mean the fund was utilizing contribution fees for working capital[.]"   This statement is conclusory, as the trial court determined, and unsupported by specific facts.  Grant did not explain in his affidavit how he arrived at this conclusion or point to facts reasonably supporting it.   It does not necessarily follow that the fact that the District takes short-term loans means that the restricted impact fee monies have been misspent.  Similarly, Grant opined, without support, that, when the District was short of funds, it used contribution fees.  The trial court did not err in finding his statements and opinions unsupported.  We agree with the trial court that Grant did not provide a factual basis for his conclusory statement that the District improperly used the impact fees.

¶ 114 Finally, we note that, in its ruling on defendant's motion to reconsider, the trial court corrected its statement at the hearing on the summary judgment motion that it gave no weight to Grant's affidavit. "Weighing and appraising the evidence is improper in deciding a summary judgment motion." *Jones v. Petrolane-Cirgas, Inc.*, 186 Ill. App. 3d 1030, 1034 (1989). The court clarified that it had misspoken and had not actually weighed the parties' affidavits.

¶ 115 In summary, the trial court did not err in granting the District summary judgment on the fourth amended counterclaim.

¶ 116                                    III. CONCLUSION

¶ 117 For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 118 Affirmed.